United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHAM-O, INC, <br><br> Plaintiff, <br><br> v. <br><br> SPORT DIMENSION, INC., <br><br> Defendant. | No. C-04-5055 EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT** <br> (Docket No. 41) |

Plaintiff Wham-O, Inc. has filed suit against Defendant Sport Dimension, Inc. for patent infringement -- more specifically, for infringement of claims 1-4 of the '593 patent. Currently pending before the Court is Sport Dimension's motion for summary judgment of noninfringement. Sport Dimension argues that Wham-O's claim of infringement, which is based on the doctrine of equivalents, must fail as a matter of law because of prosecution history estoppel and the all limitations rule. Wham-O has filed a cross-motion for summary judgment on Sport Dimension's prosecution history estoppel defense.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby GRANTS in part and DENIES in part Sport Dimension's motion for summary judgment and GRANTS Wham-O's cross-motion for summary judgment.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Only claims 1-4 of the '593 patent are at issue in this litigation. Claims 2-4 are all dependent on claim 1. The invention claimed in claim 1 of the patent is a bodyboard comprised of a foam core

to which is bonded layers of thin plastic sheeting. The outer layer of plastic sheeting is nonopaque and has graphics imprinted on the side of the sheet that faces the core. *See* '593 patent, col. 5:27-45. Claim 1 reads in its entirety as follows:

> A bodyboard for supporting a rider during travel in ocean surf, comprising:
>
> an elongate foam plank forming the core of the bodyboard, the core being made of semi-rigid foam having a thickness generally in the range of 1-inch to 4-inches,
>
> an expanse of skin bonded to the core, the skin including a plurality of layers bonded adhesively together, including an outer layer of nonopaque plastic sheet material having a thickness generally in the range of 1-mil to 5 mils, and
>
> the outer layer including graphics imprinted on the side of the sheet which faces the core, the graphics being produced by means of a process for printing graphic images on plastic sheet material, whereby the graphics are viable through the nonopaque outer layer to decorate the bodyboard.

*Id.* According to Wham-O, one of Sport Dimension's products known as the Snow Slider infringes claim 1 (as well as the dependent claims 2-4).

For purposes of this motion, the key element in claim 1 is the last -- *i.e.*, that the outer layer of plastic sheeting has graphics imprinted on the side of the sheet that faces the core.[1] The parties do not dispute that Sport Dimension's Snow Slider does not have an outer layer of plastic sheeting with graphics imprinted on the side of the sheet that faces the core. *See* Opp'n at 4 n.2 (noting that there is no literal infringement as to this particular limitation). Rather, the Snow Slider has an inner layer of plastic sheeting with graphics imprinted on the side facing away from the core (*i.e.*, the side facing the outer layer of plastic sheeting). *See* Mot. at 2 ("[D]efendant applies its graphics to the *inner layer, on the side of that layer facing away from the core* of the slider.") (emphasis in original); Opp'n at 3 ("Defendant prints graphics on the inner piece of plastic sheeting on the surface facing the outer layer . . . .").

Because the Snow Slider has graphics imprinted on the inner layer instead of the outer layer, Wham-O has not argued literal infringement of claim 1 (and the dependent claims 2-4) but rather

---

[1] For convenience, the Court shall refer to this limitation as the "outer layer limitation."

to which is bonded layers of thin plastic sheeting. The outer layer of plastic sheeting is nonopaque and has graphics imprinted on the side of the sheet that faces the core. *See* '593 patent, col. 5:27-45. Claim 1 reads in its entirety as follows:

> A bodyboard for supporting a rider during travel in ocean surf, comprising:
>
> an elongate foam plank forming the core of the bodyboard, the core being made of semi-rigid foam having a thickness generally in the range of 1-inch to 4-inches,
>
> an expanse of skin bonded to the core, the skin including a plurality of layers bonded adhesively together, including an outer layer of nonopaque plastic sheet material having a thickness generally in the range of 1-mil to 5 mils, and
>
> the outer layer including graphics imprinted on the side of the sheet which faces the core, the graphics being produced by means of a process for printing graphic images on plastic sheet material, whereby the graphics are viable through the nonopaque outer layer to decorate the bodyboard.

*Id.* According to Wham-O, one of Sport Dimension's products known as the Snow Slider infringes claim 1 (as well as the dependent claims 2-4).

For purposes of this motion, the key element in claim 1 is the last -- *i.e.*, that the outer layer of plastic sheeting has graphics imprinted on the side of the sheet that faces the core.[1] The parties do not dispute that Sport Dimension's Snow Slider does not have an outer layer of plastic sheeting with graphics imprinted on the side of the sheet that faces the core. *See* Opp'n at 4 n.2 (noting that there is no literal infringement as to this particular limitation). Rather, the Snow Slider has an inner layer of plastic sheeting with graphics imprinted on the side facing away from the core (*i.e.*, the side facing the outer layer of plastic sheeting). *See* Mot. at 2 ("[D]efendant applies its graphics to the *inner layer, on the side of that layer facing away from the core* of the slider.") (emphasis in original); Opp'n at 3 ("Defendant prints graphics on the inner piece of plastic sheeting on the surface facing the outer layer . . . .").

Because the Snow Slider has graphics imprinted on the inner layer instead of the outer layer, Wham-O has not argued literal infringement of claim 1 (and the dependent claims 2-4) but rather

---

[1] For convenience, the Court shall refer to this limitation as the "outer layer limitation."

infringement under the doctrine of equivalents only. Sport Dimension now asserts that prosecution history estoppel and the all limitations rule bar Wham-O from relying on the doctrine of equivalents to prove infringement.

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

The Federal Circuit has made clear that a determination of patent infringement requires a two-step analysis:

> First, the court must construe the asserted claim. Second, the court must determine whether the accused product or process contains each limitation of the properly construed claims, either literally or by a substantial equivalent. The first step is a question of law; the second step is a question of fact.

*Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1356-57 (Fed. Cir. 2005); *see also Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998) (noting the same); *Wright Med. Tech., Inc. v. Osteonico Corp.*, 122 F.3d 1440, 1443-44 (Fed. Cir. 1997) (noting the same).

While application of the doctrine of equivalence is generally a question of fact for the jury, summary judgment is appropriate where no reasonable fact finder could find equivalence. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997); *see also Warner-Jenkinson*

*Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997) (stating that, "where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment"). Moreover, the Supreme Court has observed that "various legal limitations on the application of the doctrine of equivalents are to be determined by the court." *Id.* In particular,

> if prosecution history estoppel would apply or if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further *material* issue for the jury to resolve.

*Id.*; *see also Seachange Internat'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (noting that application of two legal doctrines that limit infringement under the doctrine of equivalents -- *i.e.*, prosecution history estoppel and "all elements" rule -- is a question of law); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003) (stating that determinations regarding prosecution history estoppel and all elements rule are made de novo).

The Court therefore examines the two limitations on the doctrine of equivalents asserted by Sport Dimension.

B.  Prosecution History Estoppel

Prosecution history estoppel is an affirmative defense. "[It] requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002) [hereinafter *Festo VIII*]. More specifically, "[w]hen . . . the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection [by the PTO], he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent." *Id.*

> The first question in a prosecution history estoppel inquiry is whether an amendment filed in the [PTO] has narrowed the literal scope of a claim. If the amendment was not narrowing, then prosecution history estoppel does not apply. But if the accused infringer establishes that the amendment was a narrowing one, then the second question is whether the reason for that amendment was a substantial one relating to patentability. When the prosecution history record reveals no reason for the narrowing amendment, [the court must] presume[] that the patentee had a substantial reason relating to patentability;

> consequently, the patentee must show that the reason for the amendment was not one relating to patentability if it is to rebut that presumption. . . . [A] patentee's rebuttal of [this] presumption is restricted to the evidence in the prosecution history record. If the patentee successfully establishes that the amendment was not for a reason of patentability, then prosecution history estoppel does not apply.
>
> If, however, the court determines that a narrowing amendment has been made for a substantial reason relating to patentability – whether based on a reason reflected in the prosecution history record or on the patentee's failure to overcome the [above] presumption -- then the third question in a prosecution history estoppel analysis addresses the scope of the subject matter surrendered by the narrowing amendment. . . . [There is] the presumption that the patentee has surrendered all territory between the original claim limitation and the amended claim limitation. The patentee may rebut that presumption of total surrender by demonstrating that it did not surrender the particular equivalent in question according to the criteria discussed below. Finally, if the patentee fails to rebut [this] presumption, then prosecution history estoppel bars the patentee from relying on the doctrine of equivalents for the accused element.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1366-67 (Fed. Cir. 2003) [hereinafter *Festo IX*].

Regarding a patentee's rebuttal of the presumption of total surrender, the Federal Circuit has stated that this is a question of law to be determined by a court. *See id.* at 1367. There are three ways in which the patentee may overcome the presumption of total surrender: (1) "that the alleged equivalent would have been unforeseeable at the time of the narrowing amendment," (2) "that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question," or (3) "that there was 'some other reason' suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." *Id.* at 1369.

Sport Dimension argues that, as a matter of law, prosecution history estoppel bars Wham-O from making a claim of infringement based on the doctrine of equivalents. More specifically, Sport Dimension contends that the prosecution history for the patent at issue "clearly shows that Wham-O intended the claims to be limited to graphics imprinted on the outer layer [*i.e.*, not the inner layer as in Sport Dimension's product], and that Wham-O surrendered the subject matter it now claims to be equivalent [*i.e.*, graphics imprinted on the inner layer facing away from the core]." Mot. at 9.

Sport Dimension's argument is not persuasive. Sport Dimension is right that, for claim 1, Wham-O did make a narrowing amendment related to patentability. However, the amendment had nothing to do with graphics being on the outer layer only as opposed to the inner layer, which is the distinction at issue in this case. For both the pre-amendment claim 1 and the post-amendment claim 1, graphics were specified as being on the outer layer. For example, pre-amendment claim 1 provided: "'the outer layer of nonopaque polyethylene film including graphical images formed on the side of the film which faces the core, whereby the images are visible are visible through the outer layer to decorate the bodyboard.'" Mot. at 10. Post-amendment claim 1 provided: "'the outer layer including graphics imprinted on the side of the sheet which faces the core, the graphics being produced by means of a process for printing images on plastic sheet material.'" *Id.* Because both the pre-amendment claim 1 and the post-amendment claim 1 discussed graphics being on the outer layer, there could be no surrender by Wham-O of graphics being on the inner layer. *See Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1375 (Fed. Cir. 2003) ("[T]he equivalence question relates to whether 'the speech signal amplifiers . . . only supply power to the telephone set' when the receiver is off-hook. That limitation was never amended and therefore cannot be subject to the *Festo* presumption."); *IXYS Corp. v. Advanced Power Tech., Inc.*, 321 F. Supp. 2d 1133, 1142 (N.D. Cal. 2004) ("The amendment . . . served only to add an additional limitation -- the gate bus and source bus requirement -- not to modify the requirement that the second metallization layer overly at least the insulating layer. . . . IXYS therefore surrendered claim scope relating to the 'gate bus and source bus' limitation, not the 'overlying said insulating layer' limitation, which remained unchanged."); *see also Festo IX*, 344 F.3d at 1369 (noting that patentee may rebut presumption of total surrender by showing "that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent in question").

Notably, the prosecution history confirms that the amendment was intended to distinguish the invention from a prior patent, known as the Szabad patent, based on the *means* of forming images on

-6-

the plastic sheeting, not the outer layer-inner layer distinction.[2] For example, in explaining the amendment of claim 1, Wham-O stated:

> The Examiner states in paragraph 3 of the Office action that Szabad, Jr. discloses an outer layer that includes graphical images. But the only types of images Szabad, Jr. discusses are "an elongated pattern of stripes of waves" . . . or a logo applied to the bottom of the board using a transfer pattern . . . . Applicants submit that neither of those types of images is at all similar to applicants' high definition graphics applied to an interior surface of a bodyboard skin laminate.
>
> . . . . [Applicants'] preferred process imprints images using inks containing ultraviolet inhibitors, to resist fading. The graphics on applicants' bodyboard skin are sharp and distinct and can include pictures, logos, and alphanumeric characters. Because the printed images are on the inside of the laminated skin, between the layers of film, the images are resistant to wear. The sharpness and durability of applicants' bodyboard skin graphics is superior to anything taught in the Szabard, Jr. patent.
>
> In contrast with applicants' sharp printed graphics, the first embodiment skin decoration process disclosed in Szabad, Jr. specifies the addition of color concentrate between the layers of the skin during the lamination process. . . . Szabad, Jr. uses color concentrate to create randomized indistinct patterns of stripes. There is no suggestion that his decorating process could generate graphic images such as pictures, logos, or alphanumeric characters, like the graphics imprinted on the bodyboard skin of the present invention.

Duggan Decl., Ex. D at 39-41 (amendment).

Sport Dimension argues still that the amendment of claim 1 was driven by an outer layer-inner layer distinction, noting that the following statement was made by Wham-O to the PTO:

> The alternative skin decoration process disclosed in Szabad, Jr. is the use of a Mylar transfer pattern, which "may be permanently applied to the deck and/or bottom of the board" using heat and pressure. Exterior transfers are well known, but they have the disadvantage of not being wear-resistant. They are applied to the outside of the board and are easily scratched or damaged. Certainly, Szabad, Jr.'s suggestion that external transfer patterns can be used to decorate surfboards neither discloses nor suggests applicants' laminated skin structure, which employs ink-imprinted graphics on an interior surface of a skin laminate.

---

[2] Thus, post-amendment claim 1 used the terminology "graphics imprinted" as opposed to "graphics formed." The Court rejects the tortured argument regarding the use of "graphics formed" made by Sport Dimension in its reply brief.

1  *Id.* at 41 (amendment). While the above statement does make a distinction, that distinction is
2  between the exterior surface of a bodyboard and an interior surface, not the outer layer-inner layer
3  distinction discussed above. That is, both the side of the outer layer facing the core and the inner
4  layer facing away from the core are on the interior surface of a bodyboard. At most, with the above
5  statement, Wham-O surrendered only the exterior surface of the bodyboard.

6  Based on the above, the Court denies Sport Dimension's motion for summary judgment
7  based on prosecution history estoppel and grants Wham-O's cross-motion.

8  C.     All Limitations Rule

9  Sport Dimension, of course, offers an independent basis for granting summary judgment --
10 *i.e.*, that infringement by equivalents is barred by the all limitations rule. That rule was recently
11 addressed by the Federal Circuit in a case called *Freedman Seating*.

> The [all limitations] rule holds that an accused product or process is
> not infringing unless it contains each limitation of the claim, either
> literally or by equivalent. This principle has two primary implications
> for the doctrine of equivalents. First, the all limitations rule requires
> that equivalence be assessed on a limitation-by-limitation basis, as
> opposed to from the perspective of the invention as a whole. *Second,
> an element of an accused product or process is not, as a matter of law,
> equivalent to a limitation of the claimed invention if such a finding
> would entirely vitiate that limitation.*

17 *Freedman Seating*, 420 F.3d at 1358 (emphasis added). In its motion for summary judgment, Sport
18 Dimension focuses on the second as part of the rule. Sport Dimension argues that, if graphics
19 imprinted on the inner layer facing away from the core (Sport Dimension's product) could be an
20 equivalent for graphics imprinted on the outer layer facing the core (Wham-O's patent), then the
21 outer layer limitation of the claim would be entirely vitiated.

22 In discussing whether a claim limitation would be vitiated, the *Freedman Seating* court
23 emphasized that

> [t]here is no set formula for determining whether a finding of
> equivalence would vitiate a claim limitation, and thereby violate the all
> limitations rule. Rather, courts must consider the *totality of the
> circumstances of each case* and determine whether the alleged
> equivalent can be fairly characterized as an insubstantial change from
> the claimed subject matter without rendering the pertinent limitation
> meaningless.

1  *Id.* at 1359 (emphasis added).  The *Freedman Seating* court also stated that a "multi-factored
2  analysis" applies to the totality of the circumstances and discussed at length two cases as illustrations
3  of that analysis, namely, *Ethicon* and *Sage*.  *Id.*

4         The Federal Circuit explained first its prior decision in *Ethicon*.  In *Ethicon*, the patent at
5  issue was "directed to a 'lockout mechanism' for use in linear cutter staplers [which] allow a surgeon
6  to make an incision in tissue while simultaneously stapling closed each side of the incision in order
7  to prevent excessive bleeding."  *Ethicon*, 149 F.3d at 1311.  The court addressed whether two claims
8  -- claim 6 and claim 24 -- had been infringed, whether literally or by equivalents, reaching a different
9  conclusion as to each.

10         The relevant limitation for claim 6 required the lockout mechanism to be in a specific place,
11  namely, near longitudinal slots located in the stapler cartridge at the front of the stapler.  In the
12  accused product, the lockout mechanism was located nowhere near the slots -- in fact, was located
13  near the rear of the stapler.  Hence, the court concluded that no reasonable juror would find there was
14  an insubstantial difference.  *See id.* at 1318-19.

15         In contrast, for claim 24, the relevant limitation required the lockout to contact a pusher
16  assembly "during staple firing."  The accused product's lockout did not literally infringe because it
17  did not contact the pusher assembly during staple firing but rather lost contact with the pusher
18  assembly "just prior to staple firing," although it then regained contact after firing.  *Id.* at 1321.
19  Infringement by equivalents, however, was not precluded as a matter of law under these
20  circumstances.  The above physical difference between the lockout claimed in the patent and the
21  accused product's lockout "translate[d] into a 'very slight,' 'very quick' temporal difference, a
22  period that is perhaps as short as a few thousandths of a second.  Thus, [the court could not] say as a
23  matter of law that this difference is substantial.  *It is a subtle difference in degree, not a clear,*
24  *substantial difference or difference in kind, as was the case regarding claim 6.*"  *Id.* (emphasis
25  added).

26         The *Freedman Seating* court contrasted *Ethicon* with *Sage*, in which there was a
27  determination that a finding of equivalence would vitiate a claim limitation.  In *Sage*, the plaintiff
28  held a patent relating to a container for disposing of hazardous medical waste, including hypodermic

-9-

needles. *See Sage*, 126 F.3d at 1422. The claim at issue provided that the container was compromised of "an elongated slot at the top of the container body for permitting access to the interior of the container body" and a constriction "extending over such slot." *Id.* The Federal Circuit agreed with the district court that "top of the container body" meant the "highest point, level, or part of" and that "extending over said slot" required that the constriction be "above" the elongated slot. *Id.* The accused product did not have an elongated slot at the top of the container but rather had such a slot within the container body. *See id.* at 1423. The court rejected the plaintiff's assertion of the doctrine of equivalents because the accused product did not have an elongated slot that was substantially at the top of the container body and because there was no constriction extending substantially over that slot. *See id.* at 1424. The court noted that "[the plaintiff's] . . . theories place the location of the 'elongated slot' in [the] accused device far enough within the container body that, as a matter of law, no reasonable juror could find that it is located at substantially the 'top of the container.'" *Id.* In spite of the plaintiff's argument that "the claimed and accused arrangements accomplish substantially the same function, in substantially the same way, to achieve substantially the same result," the court stated the "doctrine of equivalents does not grant [the plaintiff] license to remove entirely the 'top of the container' and 'over said slot' limitations from the claim." *Id.*

The *Freedman Seating* court emphasized that, in *Sage*, the conclusion of vitiation was based on several considerations, including the simplicity of the structure, the specificity and narrowness of the claim, and the forseeability of variations at the time of filing the claim with the PTO. *See Freedman Seating*, 420 F.3d at 1360. The court then quoted from *Sage* as follows:

> The claim at issue defines a relatively simple structural device. A skilled patent drafter would foresee the limiting potential of the "over said slot" limitation. No subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this limitation at the time of its incorporation into the claim. If [the patentee] desired broad patent protection for any container that performed a function similar to its claimed container, it could have sought claims with fewer structural encumbrances. . . . Instead, [the patentee] left the PTO with manifestly limited claims that it now seeks to expand through the doctrine of equivalents. However, as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure.

*Id.* at 1360-61 (quoting *Sage*, 126 F.3d at 1425).

After discussing *Ethicon* and *Sage*, the *Freedman Seating* court addressed the specific facts in the case before it. The patent at issue was directed to a stowable seat. *See id.* at 1353. The relevant claim limitation required that the moveable end of the seat's support member be "slidably mounted to [the] seat base." *Freedman Seating*, 420 F.3d at 1352-53. The accused product employed instead a support member that was rotatably mounted to the seat base. *See id.* at 1354. "[T]he moveable end of the [accused product's] support member does not slide or otherwise move along the seatbase. Rather, its only range of motion consists of rotation throughout its revolute joints." *Id.*

Despite the plaintiff's contention that there was infringement by equivalents because the two mechanisms functioned in the same way to produce identical results, the court refused to find such because to do so would read the limitation of "'slidably mounted' completely out of the claims." *Id.* at 1362. The court added that the plaintiff's claim of infringement by equivalents suffered from many of the same problems addressed in *Sage*:

> In particular, though elegant, the subject matter claimed by the '389 patent involves relatively simple and well-known technologies. The patentees also stated that they were aware of other types of four bar mechanisms. Yet, they chose to specifically limit the claims to slider-crank mechanisms vis-a-vis the "slidably mounted" moveable end limitation. Members of the public were therefore justified in relying on this specific language in assessing the bounds of the claim. Accordingly, we think that to now say the claims included other four bar mechanisms under the doctrine of equivalents would unjustly undermine the reasonable expectations of the public.

*Id. Freedman Seating* thus makes clear that, when a court examines the totality of circumstances, specificity of the language of the claim limitation and the ease by which the structure can be described play central roles.

Relying on *Freedman Seating*, Sport Dimension argues that a finding of equivalence here (*i.e.*, that graphics imprinted on the inner layer facing away from the core could be an equivalent for graphics imprinted on the outer layer facing the core) would vitiate the outer layer limitation of the patent at issue. In light of *Freedman Seating*, the most recent pronouncement of the Federal Circuit on vitiation, the argument is compelling. The structure of the bodyboard, the invention at issue, is

-11-

relatively simple. Claim 1 specifically and plainly requires as an element an "outer layer including graphics imprinted on the side of the sheet which faces the core." '593 patent, col. 5:40-41. Moreover, the variation of graphics being imprinted on the inner layer facing away from the core (instead of on the outer layer facing the core) should have been foreseeable. Not only is the structure of the bodyboard simple, in amending claim 1, the patentee expressed to the PTO the importance of imprinting of graphics on the interior surface of the bodyboard in order to achieve wear resistance. Obviously, the interior surface would include all of the layers and sides of plastic sheeting other than the outer layer facing away from the core, including the inner layer facing away from the core. The patentee could have easily included in the claim a limitation of imprinting the graphics on the inner layer facing away from the core in addition to imprinting on the outer layer facing the core. Wham-O has not cited any "subtlety of language," "complexity of the technology," or "any subsequent change in the state of the art, such as later-developed technology" which "obfuscated the significance of [the] limitation at the time of its incorporation into the claim." *Sage*, 126 F.3d at 1425. The patentee had a "clear opportunity to negotiate broader claims." *Id.*

Without taking issue of these factors, Wham-O argues that nonetheless there is no functional difference between the claimed invention and the accused product -- more specifically, that there is no functional difference between the imprinting of graphics on the inner layer facing away from the core and the imprinting of graphics on the outer layer facing the core. *See, e.g.*, Paschal Decl. ¶ 8. Wham-O analogizes the process to buttering bread: It makes no difference which slice of the bread is buttered; once pressed together into a sandwich, the end result is the same. According to Wham-O, the key result is that the graphics are "sandwiched" between the two transparent layers to protect it from exterior wear and diffusion onto the core. Notably, Sport Dimension conceded (at the hearing on the motions for summary judgment) that, for purposes of the motions at least, there is no functional difference nor any manufacturing advantage between its product and the claimed invention.

In advancing the above argument, Wham-O relies upon *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed. Cir. 1989). In *Corning Glass*, the patent was "relate[d] to optical waveguide fibers of the type now widely used for telecommunications." *Id.* at 1254. The

claim at issue covered a fiber comprised of a doped fused silica core and a fused silica cladding (doping optional), wherein the refractive index of the core was greater than that of the cladding. *See id.* at 1256. The claim limitation specified that the positive dopant was applied to the core in order to achieve the differential in refractive index. In the accused product, a negative dopant was applied to the cladding and not the core. The alleged infringer argued that it could not infringe by equivalents because "nothing was substituted *in the core* of [its product] for a dopant which performed the function of increasing the core's refractive index." *Id.* at 1259 (emphasis in original). The Federal Circuit disagreed, stating that infringement by equivalents was possible by virtue of the fact that a negative dopant was added to the cladding layer to make the core's refractive index greater. *See id.* The court thus upheld the district court's finding that the accused product performs "substantially the same function in substantially the same way to obtain the same result." *Id.* at 1258. Wham-O argues that the analysis in *Corning Glass* dictates the same result here.

*Corning Glass*, decided in 1989, was not cited by the Federal Circuit in either *Freedman Seating* or *Sage*. Reconciling *Corning Glass*'s emphasis on function and *Freedman Seating*'s emphasis on clarity of claim language is, at first blush, problematic. Although Wham-O's position is not without substantial force, the Court finds *Corning Glass* inapposite for several reasons.

First, the court in *Corning Glass* did not apply both aspects of the all limitations rule. Having stated that "[a]n equivalent must be found for every limitation of this claim somewhere in the accused device," the court then proceeded to engage in a substantive analysis of equivalency, approving the function/way/result analysis employed by the district court. *See id.* at 1259-61. In so doing, the court treated the trial court's finding of equivalence as a question of fact subject to the "clearly erroneous" scope of review. *Id.* at 1261. Significantly, the court did not cite or discuss the second element of the all limitations rule -- whether a finding of equivalence "would entirely vitiate the limitation." *Freedman Seating*, 420 F.3d at 1358. Its failure to do so is understandable since that aspect of the all limitations rule was not clearly articulated until the Supreme Court's ruling in *Warner-Jenkinson*, 520 U.S. at 29, which was not issued until almost ten years later.

That *Corning Glass* did not apply the all limitations rule is further confirmed by the scope of review employed. As noted above, unlike the substantive test for infringement by equivalents which

generally is a question of fact (*see* N.D. Cal. Model Patent Jury Instruction No. 3.4), the limitation on the doctrine of equivalents embodied in the all limitations rule is a question of law. *Compare Corning Glass*, 868 F.2d at 1261 (clear error review), *with Lockheed Martin*, 324 F.3d at 1320-21 (de novo review). *Cf. Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1109 (Fed. Cir. 2000) (in finding no infringement by equivalents, distinguishing *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30 (1929), because "*Sanitary Refrigerator* lacks any discussion of the All Limitations Rule, the vitality of which the Supreme Court has more recently confirmed"; citing *Warner-Jenkinson*, 520 U.S. at 29).

Second, *Corning Glass*'s affirmance of the district court's application of the function/way/result test has less, if any, applicability to the vitiation prong of the all limitations rule at issue here. There is a substantial difference between roles and applications of the vitiation prong of the all limitations rule and the substantive analysis of infringement by equivalents. The former is a threshold question for the court focusing on the language of the claim limitation. As noted above, in applying the all limitations rule, the court in *Freedman Seating* focused on the specificity of the limitation and the described structures. The court emphasized the ease by which the patentee could have negotiated a broader claim given the simplicity of the structure and the then-existent state of the art. *See Freedman Seating*, 420 F.3d at 1360-61. While some courts appear to have taken into account the degree of functional differences in determining whether a finding of infringement by equivalents would vitiate a claim limitation (*see e.g.*, *Wright*, 122 F.3d at 1445; *Ethicon*, 149 F.3d at 1320-22), the recent trend in the Federal Circuit has been to afford primacy to the language of the claims with little regard to the analysis of function. *See DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1332 (Fed. Cir. 2001) ("DeMarini improperly directed the district court's attention away from the language of the claims . . . ."). *See, e.g.*, *Seachange.*, 413 F.3d at 1378 (finding indirect network connection equivalent would vitiate limitation requesting point-to-point connection; no discussion of functional differences); *Searfoss v. Pioneer Consolidated Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) (allowing "indirect connection" to be equivalent would completely vitiate direct connection limitation of claim); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) (concluding that permitting infringement by equivalents would vitiate express limitation of conical

surface despite evidence that hemispherical or trapezoidal cup functioned in same way as conical shape). *Freedman Seating*'s particular emphasis on the "simplicity of the structure, the specificity and narrowness of the claim, and the forseeability of variations at the time of filing the claim with the PTO," *Freedman Seating*, 420 F.3d at 1360, reflects a distinct policy preference established in *Sage*:

> This court recognizes that such reasoning places a premium on forethought in patent drafting. Indeed this premium may lead to higher costs of patent prosecution. However, the alternative rule -- allowing broad play for the doctrine of equivalents to encompass foreseeable variations, not just of a claim element, but of a patent claim -- also leads to higher costs. Society at large would bear these latter costs in the form of virtual foreclosure of competitive activity within the penumbra of each issued patent claim. Because the doctrine of equivalents blurs the line of demarcation between infringing and non-infringing activity, it creates a zone of uncertainty, into which competitors tread only at their peril. Given a choice of imposing the higher costs of careful prosecution on patentees, or imposing the costs of foreclosed business activity on the public at large, this court believes the costs are properly imposed on the group best positioned to determine whether or not a particular invention warrants investment at a higher level, that is, the patentees.

*Sage*, 126 F.3d at 1425.

This Court finds particularly persuasive *Freedman Seating*'s discussion of *Ethicon*. In rejecting the assertion of infringement by equivalents on claim 6, the *Ethicon* court noted that the limitation expressly tied the lockout mechanism to a specific place -- namely, near longitudinal slots located in the stapler cartridge at the front of the stapler. Because the lockout mechanism of the accused product was instead "'located at the distal end of the [disposable loading unit,] nowhere near the longitudinal slots which [were] located in the staple cartridge at the front end of the stapler,'" there could be no equivalence. *Freedman Seating*, 430 F.3d at 1360 (quoting *Ethicon*, 149 F.3d at 1318-19). As in *Ethicon*, the claim limitation at issue in the instant case specifically locates the imprinting of the graphics on the outer layer, not the inner layer. Given the simplicity of this structure and clarity of the limitation, imprinting the graphics on the inner layer rather than the outer layer constitutes a "difference in kind," not a "subtle difference in degree." *Ethicon*, 149 F.3d at 1321.

1. Finally, although there is no requirement that equivalents be unknown to science at the time of the patent application, *see DeMarini Sports*, 239 F.3d at 1333, *Freedman Seating* and *Sage* make clear that a "'subsequent change in the state of the art'" is a material factor in examining the totality of the circumstances under the all limitations rule. *See Freedman Seating*, 420 F.3d at 1360 (quoting *Sage*, 126 F.3d at 1425). The court in *Corning Glass* specifically pointed out that "the '915 specification mentions only such positive dopant materials [because,] [a]t the time the application was filed, the inventors did not know of specific dopants that would decrease the RI of fused silica, although it had been known in the art since 1954 that the introduction of fluorine decreases the RI of certain multicomponent glasses." *Corning Glass*, 868 F.2d at 1255; *see also Ethicon*, 149 F.3d at 1319 ("Because 'the inventors did not know of specific dopants that would decrease the RI of fused silica,' the asserted claims recited 'a core formed of fused silica to which a dopant material on at least an elemental basis has been added,' *i.e.*, a positively doped core."). In contrast, Wham-O does not dispute that printing graphics on the inner layer facing away from the core was entirely forseeable and not beyond known technology when the patent application herein was filed.

### III.  CONCLUSION

Accordingly, for the foregoing reasons, the Court grants Sport Dimension's motion for summary judgment based on the all limitations rule. It does so while acknowledging that Wham-O's arguments and reliance on *Corning Glass* is not without force. However, the recent decisions of the Federal Circuit following the Supreme Court's decision in *Warner-Jenkinson*, particularly the Circuit's most recent decision in *Freedman Seating*, dictate this conclusion. If there is a paradigm case in which the simplicity of the structures, specificity of the claim limitation, and ease by which the patentee would have claimed the accused element, this is it.

///
///
///
///
///
///

The Court thus grants Sport Dimension's motion for summary judgment with respect to the all limitations rule but denies the motion with respect to prosecution history estoppel. The Court also grants Wham-O's motion for summary judgment with respect to prosecution history estoppel.

The Clerk of the Court is directed to enter judgment in favor of Sport Dimension and close the file in this case.

This order disposes of Docket No. 41.

IT IS SO ORDERED.

Dated: November 9, 2005

EDWARD M. CHEN
United States Magistrate Judge